# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA


JAMES WILLIAM MCBRIDE,      :       CIVIL ACTION
              Petitioner,     :

      v.                  :

GEORGE PATRIC, THE DISTRICT   :
ATTORNEY OF NORTHAMPTON   :
COUNTY, THE ATTORNEY GENERAL :
OF THE STATE OF PENNSYLVANIA, and :
SUPERINTENDENT GRACE,      :
SCI HUNTINGDON, PA, et al.,    :
             Respondents.   :    No. 06-2085

## MEMORANDUM

LOWELL A. REED, JR., Sr. J.              April 29, 2011

Presently before the Court is a counseled Amended Petition for Writ of Habeas Corpus filed by James William McBride ("Petitioner") pursuant to 28 U.S.C. § 2254.  (Doc. Nos. 1, 24 and 25).  The Petitioner is currently incarcerated at the State Correctional Institution located in Houtzdale, Pennsylvania.  For the reasons that follow, the petition will be denied.

## I.    FACTS AND PROCEDURAL HISTORY:[1]

James and Kelly McBride had a party at their home on February 17, 1984.  According to Petitioner, Kelly McBride left home on the morning of February 18, 1984, and he never

---

[1]This information is taken from the Amended Petition for Writ of Habeas Corpus, the Memorandum of Law in Support of the Petition, the Response thereto, the exhibits to those documents, and the state court record.

saw her again. Kelly McBride was reported missing in March 1984 by her parents, (N.T.[2] 5/8/01, at 127), and neither she nor her body has been found. The McBrides' neighbor, Judith Seagraves, testified that on May 25, 1984, she observed Petitioner's father and his landlord removing a bloody mattress from the apartment. (N.T. 5/8/01, at 156-58). After conducting a search of the McBride home, police found a bureau which had been nailed shut with boards. (N.T. 5/8/01, at 167-168). The insides of the bureau had been removed and traces of blood and hair were found inside. Id. In 1993, through the use of DNA technology, police were able to connect Kelly McBride with blood found on the mattress and the bureau seized from the McBrides' residence. (N.T. 5/8/11, at 152-153; 5/9/11, at 84-95; 5/14/01, at 16-17, 21-22). On November 4, 1999, an investigative grand jury was convened and investigated Kelly McBride's disappearance. On March 6, 2000, the Grand Jury recommended charging Petitioner with Kelly McBride's murder. Sixteen (16) years after Kelly McBride's disappearance, Petitioner was arrested in Florida, where he was remarried and living under a different name. (N.T. 5/10/01, at 87-92).

On May 15, 2001, following a jury trial before the Honorable Robert Simpson of the Northampton County Court of Common Pleas, Petitioner was convicted of first-degree murder and subsequently sentenced to life imprisonment. Petitioner's conviction was affirmed by the Superior Court of Pennsylvania on October 23, 2002. Commonwealth v. McBride, 815 A.2d 1129 (Pa. Super. 2002); No. 2939 EDA 2001 (Pa. Super. 2002)

_____

[2]Notes of testimony, hereinafter "N.T."

(unpublished memorandum). Petitioner's petition for allowance of appeal to the Pennsylvania Supreme Court was denied on May 6, 2003. <u>Commonwealth v. McBride</u>, 821 A.2d 586 (Pa. 2003); No. 956 MAL 2002 (Pa. 2003).

On June 25, 2003, Petitioner filed a <u>pro se</u> petition in the state court seeking relief under the Post Conviction Relief Act ("PCRA"), 42 Pa. C.S.A. § 9541, <u>et seq.</u> Following the appointment of counsel and the filing of an amended petition, the PCRA Court held a hearing on February 2, 2004, and held a second hearing on March 12, 2004. The Court denied the PCRA petition on August 5, 2004.[3] <u>Commonwealth v. McBride</u>, No. 1319-2000 (PCRA Ct. Aug. 5, 2004). On October 25, 2005, the Superior Court affirmed the denial of the PCRA petition. <u>Commonwealth v. McBride</u>, 889 A.2d 115 (Pa. Super. 2005); No. 2521 EDA 2004 (Pa. Super. 2005) (unpublished memorandum). Petitioner's petition for allowance of appeal to the Supreme Court of Pennsylvania was denied on April 25, 2006. <u>Commonwealth v. McBride</u>, 898 A.2d 1070 (Pa. 2006); No. 1012 MAL (2005).

---

[3]The claims presented to the PCRA court involved allegations of ineffective assistance of Petitioner's trial counsel. Petitioner specifically alleged that counsel was ineffective: (1) for failing to object to testimonial references to Petitioner's post-<u>Miranda</u> silence, and/or by failing to request a mistrial or limiting instructions in relation thereto; (2) for allowing a key prosecution witness to testify by videotape deposition in violation of the Confrontation Clause and/or by failing to effectively impeach said witness; (3) for failing to request a continuance or mistrial after receiving <u>Brady</u> and discovery material during the fourth day of trial; (4) for failing to properly brief allegations of prosecutorial misconduct and/or by failing to object to material misstatements of facts by the prosecutor and other improper argument constituting prosecutorial misconduct; (5) for failing to move for dismissal of the charges based on pre-arrest delay violating Petitioner's due process rights; (6) for failing to call any character witness familiar with Petitioner at the time of the alleged offense; (7) for failing to move to suppress Petitioner's allegedly inculpatory statements based on the *corpus delecti* rule; and (8) for failing to file a motion challenging the search of Petitioner's home.

Petitioner filed a pro se Petition for a Writ of Habeas Corpus on May 1, 2006.[4] (Doc. No. 1). The original Petition alleged numerous claims of ineffective assistance by Petitioner's trial and appellate counsel. The case was assigned to the docket of the Honorable Anita B. Brody, United States District Court Judge for the Eastern District of Pennsylvania. On May 24, 2006, Judge Brody referred the petition to former Magistrate Judge Charles B. Smith for preparation of a Report and Recommendation ("R&R"). (Doc. No. 2). On July 27, 2006, Judge Smith issued his R&R recommending denial of the petition. (Doc. No. 7). On August 9, 2006, Petitioner filed objections to the R&R, and on August 23, 2006, Petitioner filed corrections to the objections. (Doc. Nos. 8, 9).

On December 15, 2006, Judge Brody appointed counsel to represent Petitioner. (Doc. No. 11). On January 15, 2008, counsel filed an amended habeas petition on Petitioner's behalf. (Doc. Nos. 24, 25). On February 7, 2008, Judge Brody denied Judge Smith's R&R as moot due to the Amended Petition. (Doc. No. 26).

On March 11, 2008, Respondents filed an answer to Petitioner's amended petition. (Doc. No. 31). Petitioner filed a reply on April 17, 2008. (Doc. No. 34). The case was reassigned to the undersigned on February 25, 2009. (Doc. No. 35).

In his amended petition, Petitioner claims that trial counsel was ineffective for:

---

[4]Generally, a pro se petitioner's habeas petition is deemed filed at the moment he delivers it to prison authorities for mailing to the district court. Burns v. Morton, 134 F.3d 109, 113 (3d Cir. 1998). Petitioner signed his original pro se habeas petition on May 1, 2006; therefore, I will assume that he presented his petition to prison authorities on that date.

(1) failing to object to numerous references to Petitioner's constitutionally protected post-<u>Miranda</u> silences;

(2) failing to object to the admission of videotaped testimony of a critical witness for the prosecution, despite the availability of that witness to testify at trial; and

(3) failing to object to material misstatements of fact and improper testimonial arguments by the prosecution.

Respondents contend that each of these claims is meritless and the amended petition must be denied.

## II.   <u>LEGAL STANDARD</u>:

Pursuant to 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a petition for habeas corpus may only be granted if (1) the state court's adjudication of the claim resulted in a decision contrary to, or involved an unreasonable application of, "clearly established Federal law, as determined by the Supreme Court of the United States;" or if (2) the adjudication resulted in a decision that was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). Factual issues determined by a state court are presumed to be correct and the petitioner bears the burden of rebutting this presumption by clear and convincing evidence. <u>Werts v. Vaughn</u>, 228 F.3d 178, 196 (3d Cir. 2000) (citing 28 U.S.C. § 2254(e)(1)).

The Supreme Court expounded upon this language in <u>Williams v. Taylor</u>, 529 U.S. 362 (2000). In <u>Williams</u>, the Court explained that "[u]nder the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that

reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." 529 U.S. at 412-413 (quoted in Hameen v. Delaware, 212 F.3d 226, 235 (3d Cir. 2000)). The Court in Williams further stated that "[u]nder the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. The "unreasonable application" inquiry requires the habeas court to "ask whether the state court's application of clearly established federal law was objectively unreasonable." Id. at 409. "In further delineating the 'unreasonable application of' component, the Supreme Court stressed that an unreasonable application of federal law is different from an incorrect application of such law and a federal habeas court may not grant relief unless that court determines that a state court's incorrect or erroneous application of clearly established federal law was also unreasonable." Werts, 228 F.3d at 196 (citing Williams, 529 U.S. at 411).

Claims of ineffective assistance of counsel are governed by Strickland v. Washington, 466 U.S. 668 (1984). In Strickland, the United States Supreme Court set forth the standard for a petitioner seeking habeas relief on the grounds of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so

serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

<u>Id.</u> at 687.

Because "it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable," a court must be "highly deferential" to counsel's performance and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." <u>Strickland</u>, 466 U.S. at 689. In determining prejudice, "the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." <u>Id.</u> at 695.

"It is past question that the rule set forth in <u>Strickland</u> qualifies as 'clearly established Federal law, as determined by the Supreme Court of the United States.'" <u>Williams</u>, 529 U.S. at 391. Thus, Petitioner is entitled to relief if the Pennsylvania courts' decision rejecting his claims of ineffective assistance of counsel was either "contrary to, or involved an unreasonable application of," that established law. <u>Id.</u>; <u>see also</u> <u>Woodford v. Visciotti</u>, 537 U.S. 19, 24-25 (2002); <u>Bell v. Cone</u>, 535 U.S. 685, 698-699 (2002) ("It is not enough to convince a federal habeas court that, in its independent judgment, the state–court decision applied <u>Strickland</u> incorrectly." ).

III.    **DISCUSSION:**

   A.    **Whether Certain Statements of Fact As Related By the Pennsylvania Superior Court Are Entitled to Deference.**

As a threshold matter, Petitioner first contends that this Court should not give deference to three alleged incorrect factual findings by the Pennsylvania Superior Court. As Petitioner correctly notes, 28 U.S.C. § 2254(e)(1) requires that "a determination of a factual issue made by a State court shall be presumed to be correct" unless the petitioner rebuts "the presumption of correctness by clear and convincing evidence." Taylor v. Horn, 504 F.3d 416, 429 (3d Cir. 2007) (citing Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001)); Meyers v. Gillis, 142 F.3d 664, 667 (3d Cir. 1998) (holding that the district court properly refused to apply presumption of correctness to state court finding of fact when the state court's factual conclusion was clearly inconsistent with the state court record).

Petitioner first challenges the state courts' inclusion of the alleged testimony of Ms. Dawn DeLong in its factual summary of Petitioner's appeals. Ms. DeLong testified at Petitioner's preliminary hearing, but the prosecution did not call her as a witness at trial. (N.T. 5/9/01, at 4-8). In both its opinion on Petitioner's direct appeal from his judgment of sentence and on collateral appeal, the Superior Court included a lengthy paragraph purportedly summarizing Ms. DeLong's testimony at trial. Commonwealth v. McBride, No. 2939 EDA 2001, at 3 (Pa. Super. Oct. 23, 2002); Commonwealth v. McBride, No. 2521 EDA 2004, at 11 (Pa. Super. Oct. 25, 2005). Because Ms. Delong did not testify at trial, the state court erroneously included her testimony in its factual summary. It would thus be improper

8

for any court to use evidence derived from that testimony in the disposition of Petitioner's claims. I note that the state courts have not explicitly relied upon this testimony in denying Petitioner's claims.[5] I stress, however, that this Court is not required to rely upon, nor has it relied upon, Ms. DeLong's testimony when considering any aspect of the instant petition. See 28 U.S.C. § 2254(e)(1).

In his second challenge, Petitioner properly points out that the Superior Court of Pennsylvania incorrectly found that Petitioner's neighbor, Judith Seagraves, testified that on May 25, 1984, she witnessed Petitioner help his father remove a mattress from his apartment. Commonwealth v. McBride, No. 2939 EDA 2001, at 2 (Pa. Super. Oct. 23, 2002); Commonwealth v. McBride, No. 2521 EDA 2004, at 10 (Pa. Super. Oct. 25, 2005) (N.T. 5/8/01, at 156-58). Review of the trial transcript reveals that Ms. Seagraves actually testified that she witnessed Petitioner's father and landlord removing a mattress from his apartment on that date. (N.T. 5/8/01, at 157-58). Indeed, the parties stipulated at trial that Petitioner was incarcerated on unrelated charges on May 25, 1984. (N.T. 5/14/01, at 53). As a result, it would not have been possible for Petitioner to remove the mattress on that date. As with

---

[5]I cannot rule out the impact of this evidence in broad discussions of the evidence, however. For example, in determining that there was no prejudice in Petitioner's videotaped deposition claim, the PCRA court explained the claim could be denied on prejudice grounds because the "the Commonwealth produced independent evidence connecting . . . Petitioner to the murder of Kelly McBride." Commonwealth v. McBride, No. 1319-2000, at 14 (PCRA Ct. Aug. 5, 2004). The Superior Court adopted the PCRA's court reasoning on this issue when reviewing this claim. Commonwealth v. McBride, No. 2521 EDA 2004, at 12 (Pa. Super. Oct. 25, 2005). The foregoing evidence may have formed at least part of the basis of that decision. As discussed more fully *infra*, however, I do not reach the prejudice aspect of the state court decision. Therefore, any erroneous reliance upon this faulty information by the state courts is rendered harmless.

Petitioner's previous claim, the state courts did not explicitly rely upon this testimony in denying Petitioner's claims.[6]  However, I note that this Court is not required to presume that Petitioner helped to remove the mattress from his apartment when reviewing Petitioner's claims.  See 28 U.S.C. § 2254(e)(1).

Finally, Petitioner contends that the Superior Court misconstrued the testimony of Annette Beck because the court focused only on the portion of her testimony in which she indicated that Petitioner told her that he had killed Kelly McBride.  Commonwealth v. McBride, No. 2939 EDA 2001, at 4 (Pa. Super. Oct. 23, 2002); Commonwealth v. McBride, No. 2521 EDA 2004, at 11 (Pa. Super. Oct. 25, 2005).  On collateral appeal, the Superior Court used this testimony as conclusive evidence of guilt, concluding that challenged references to Petitioner's post-Miranda silence were not prejudicial because they were "merely cumulative of the testimony of Annette Beck, to whom [Petitioner] repeatedly admitted his guilt." Commonwealth v. McBride, No. 2521 EDA 2004, at 12 (Pa. Super. Oct. 25, 2005).  Petitioner argues that the Superior Court failed to provide the proper context for the testimony.  More specifically, Petitioner contends that the court failed to note that, according to Ms. Beck's testimony, Petitioner made each alleged confession in a joking manner, and that Ms. Beck understood each statement to be a joke. (N.T. 5/9/01, at 112, 114, 116-18).  Moreover, as Petitioner notes, Ms. Beck's cousin, Denise Bickford, the only witness to Petitioner's conversation with Ms. Beck, also testified that these alleged comments

---

[6]See footnote, 4, supra.

came up "[i]n conversation. In joking around . . . He seemed like he was joking around."[7]

(N.T. 8/9/01, at 125-26). Based upon these statements, Petitioner contends that the record

indicates that he never "confessed" to Annette Beck that he murdered Kelly McBride, but

instead, made a few joking comments, albeit in bad taste, in response to repeated "nagging"

inquiries from his girlfriend. Thus, Petitioner contends that this Court is not required to

presume that Petitioner "confessed" to Ms. Beck that he killed Kelly McBride.

I conclude that the state courts unreasonably characterized Ms. Beck's testimony as

a straightforward confession to the murder of Kelly McBride. Review of the testimony

clearly indicates that the statements were understood to be delivered in a joking manner.

Consequently, the state court's determination on this factual issue is not entitled to deference

by this Court. See 28 U.S.C. § 2254(e)(1).

**B.      Whether Trial Counsel Was Ineffective for Failing to Object to the
          Prosecution's References to Petitioner's Exercise of His Fifth Amendment
          Right to Remain Silent.**

In his first claim, Petitioner claims that trial counsel was ineffective for failing to

object when the prosecution improperly referred to occasions when Petitioner exercised his

Fifth Amendment right to remain silent. Petitioner also alleges that trial counsel erroneously

referenced his post-arrest silence during his cross examination.

---

[7]Petitioner testified that in response to repeated questions by his then-girlfriend Ms. Beck, he "told her one time I said, look, if I just tell you I did it, would you be quiet about it and leave me alone. And she kind of laughed about it." (N.T. 5/14/01, at 84).

The Third Circuit has recently set forth the law governing a claim of a Fifth

Amendment violation:

> Once a criminal defendant receives the prophylactic warnings required by <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), it is improper under <u>Doyle [v. Ohio</u>, 426 U.S. 610 (1976)] "for a prosecutor to cause the jury to draw an impermissible inference of guilt from a defendant's post-arrest silence." <u>Hassine v. Zimmerman</u>, 160 F.3d 941, 947 (3d Cir. 1998). This is so because <u>Miranda</u> warnings carry the Government's "implicit assurance" that an arrestee's invocation of the Fifth Amendment right to remain silent will not later be used against him. [<u>Gov't of the V.I. v.</u> ] <u>Davis</u>, 561 F.3d [159,] 163-64 [(3d Cir. 2009)] quoting <u>Wainwright v. Greenfield</u>, 474 U.S. 284, 290-91 (1986)); <u>United States v. Johnson</u>, 302 F.3d 139, 146 (3d Cir. 2002). Because a defendant's post-<u>Miranda</u> warning silence could be nothing more than an invocation of his right to silence, it would be fundamentally unfair to permit a breach of that assurance by allowing impeaching questions as to why he failed to give an exculpatory account to the police after receiving the warnings. <u>See</u> <u>Davis</u>, 561 F.3d at 163. Not every reference to a defendant's silence, however, results in a <u>Doyle</u> violation. Where "no governmental action induce[s] the defendant to remain silent," <u>Fletcher v. Weir</u>, 455 U.S. 603, 606 (1982), the <u>Miranda</u>-based fairness rationale does not control. Consequently, the Government permissibly may impeach a defendant's testimony using his pre-arrest silence, <u>Jenkins v. Anderson</u>, 447 U.S. 231, 240 (1980); his post-arrest, pre-<u>Miranda</u> warning silence, <u>Fletcher</u>, 455 U.S. at 605-07; and any voluntary post-<u>Miranda</u> warning statements, <u>Anderson v. Charles</u>, 447 U.S. 404, 408-09 (1980). Additionally, under <u>Greer v. Miller</u>, 483 U.S. 756 (1987), "there may be no <u>Doyle</u> violation where the trial court sustains an objection to the improper question and provides a curative instruction to the jury, thereby barring the prosecutor from using the silence for impeachment." <u>Davis</u>, 561 F.3d at 164 (citing <u>Greer</u>, 483 U.S. at 764-65).

Virgin Islands v. Martinez, 620 F.3d 321, 335 (3d Cir. (Virgin Islands) 2010) (footnote excluded).

In the instant case, Petitioner contends that his counsel was ineffective for allowing the admission of the following three references to Petitioner's post-Miranda silences: (1) during the prosecution's direct examination of Agent Fritz; (2) during trial counsel's cross-examination of Agent Fritz; and (3) during the prosecution's cross-examination of Petitioner.

**1.    References During the Prosecution's Direct Examination of Agent Fritz.**

Petitioner contends that the prosecution first infringed upon his Fifth Amendment rights during its direct examination of FBI Agent Fritz. (N.T. 5/10/01, at 4-36). Agent Fritz testified that he interviewed Petitioner twice. The first interview was on May 1, 1984, when Petitioner voluntarily appeared at the office of the FBI in Allentown to provide information regarding the disappearance of Kelly McBride. (Id. at 12-23). The second interview occurred on May 30, 1984, when Agent Fritz interviewed Petitioner at the Lehigh County Prison, where Petitioner was incarcerated on an unrelated matter.[8] (Id. at 26-36).

At trial, the prosecution asked Agent Fritz to read aloud portions of his report that had been highlighted by the prosecution. (N.T. 5/10/01, at 13). After Agent Fritz provided his

---

[8] The record does not indicate whether Petitioner was advised of his Miranda rights on May 1, 1984. (N.T. 5/10/01, at 12-23). Agent Fritz stated that on May 30, 1984, he provided Petitioner with "an interrogation advised of rights form" and that Petitioner indicated that he understood the form and its contents. (N.T. 5/10/01, at 26).

account of the May 1, 1984 interview, trial counsel presented a hearsay objection to Agent Fritz reading aloud portions of Petitioner's second interview from May 30, 1984. (N.T. 5/10/01, at 23-24). After overruling trial counsel's objection, the trial judge admitted the testimony from the May 30th interview for "the effect on the hearer," and gave a limiting instruction that specifically directed the jury to focus on Petitioner's reaction to his interrogator, which in this case, included his silence in response to certain questions.[9] (N.T. 5/10/01, at 24-26). Agent Fritz then read his notes from his interview with Petitioner on May 30th, which stated, in part:

> When specifically asked whether he had been in the company of one  – blacked out –  the day following his wife's disappearance, McBride would not answer.

> McBride was asked if he was aware of the fact that a large amount of blood, appeared to be blood, had been found on a mattress in his apartment. McBride would not respond.

> McBride was asked whether he had any knowledge of a foot locker or a trunk previously located in his attic, and McBride stated he had no such knowledge. He asked whether he knew where a sleeping bag of his was located, and he would not answer.

> McBride was asked whether he had ever been involved in the assault or murder of his wife. McBride denied any such knowledge, indicated that he loved his wife. McBride was asked whether the blood located in his apartment

---

[9]The trial court instructed the jury as follows:
This information is being submitted to you for a limited purpose. . . . [I]t's being offered to you, and may be considered by you only so that you can evaluate the effect on Mr. McBride when he hears these things. It's offered to show the effect on the listener, on the hearer. So when there is a reference in the upcoming interview about things other people said, you're not to focus on whether or not they actually said those things or whether or not those things are true. Rather, you're to focus on how, if at all, Mr. McBride reacts to that information.
(N.T. 5/10/01, at 25-26).

could have been caused by the death of his wife or an assault on her person. McBride did not respond.

McBride then sat in complete silence for several moments and then indicated that he did not wish to continue the interview. McBride abruptly left the interview space, and the interview was terminated.

(N.T. 5/10/01, at 32-33). Counsel did not object to the testimony on Fifth Amendment grounds, did not request a mistrial on those grounds and did not request limiting instructions thereto. (N.T. 2/2/04, at 55-56).

In reviewing this claim, the state court first determined that Petitioner had asserted his Fifth Amendment right to silence and then concluded that the prosecution had improperly introduced Petitioner's silence in its case-in-chief.[10] The state court then examined whether trial counsel had a reasonable basis for not objecting to the testimony:

---

[10]In addressing Petitioner's Miranda claims with regard to his interviews with Agent Fritz, Respondents focus upon the fact that Petitioner was not under arrest or in custody during these two interviews. In arguing that there was no constitutional violation, they contend that Petitioner voluntarily waived his Miranda rights and voluntarily answered police questions in these interviews. This conclusion is foreclosed by the following well-reasoned decision of the state court:

> Although the Petitioner volunteered for the first interview and willingly answered questions during the second interview, he is not precluded from later asserting his Fifth Amendment right of silence. See Commonwealth v. Dulaney, [295 A.2d 328 (Pa. 1972)]. Additionally, it does not matter that Petitioner failed to explicitly assert his right to silence. "We cannot expect suspects under interrogation to talk like lawyers." See Commonwealth v. Mitchell, 369 A.2d 846, 849 fn. 3 (Pa. Super. 1977). We find that when the Petitioner was asked the series of accusatory questions by Agent Fritz and remained silent or would not respond to the questions, he was asserting his Fifth Amendment right of silence.

Commonwealth v. McBride, No. 1319-2000, at 7 (PCRA Ct. Aug. 5, 2004); Commonwealth v. McBride, No. 2521 EDA 2004, at 8 (Pa. Super. 2005). This aspect of the state court decision is not contrary to, nor an unreasonable application of, federal constitutional law, thus I conclude that the state court properly determined that Petitioner asserted his Fifth Amendment right of silence during his interviews with Agent Fritz. See 28 U.S.C. § 2254(d).

Attorney Lauer testified at the PCRA hearing that he did not object to the testimony because it was a theory of the defense. Attorney Lauer testified that his strategy was to show that the Petitioner cooperated with law enforcement in the investigation of his missing wife, and to show that the police failed to properly investigate the matter and that they hadn't looked much further than the Petitioner. (N.T., 2/2/04, at 116-118).

After a review of the testimony and trial strategy, we cannot find that Attorney Lauer's actions were without a reasonable basis to effectuate his client's interests. Attorney Lauer is a well known and very experienced criminal defense attorney in Northampton County and he made some strategic choices in furtherance of the defense theme. The mere fact that Attorney Lauer's trial strategy was ultimately unsuccessful does not render it unreasonable. Accordingly, we find that the Petitioner's claim must fail.

Commonwealth v. McBride, No. 1319-2000, at 7-8 (PCRA Ct. Aug. 5, 2004).[11]

I conclude that the state courts' ruling was not contrary to or an unreasonable application of federal law. I find it troubling that trial counsel appears ambivalent about whether the testimonial references were improper or may have been the subject of a

---

[11]On appeal, the Superior Court went on to analyze the prejudice prong of Petitioner's claim of ineffective assistance of counsel. Id. In doing so, the court stated:

In light of the established facts of record, we conclude that [Petitioner] suffered no prejudice from the testimonial references to his post-Miranda silence. Even if the jury perceived [Petitioner's] silence as a tacit admission of guilt, this was merely cumulative of the testimony of Annette Beck, to whom [Petitioner] repeatedly admitted his guilt. Thus, we discern no reasonable probability that the outcome of the trial would have been different absent Agent Fritz's testimonial references to Appellant's silence. Appellant has failed to establish that his trial counsel was ineffective for failing to object thereto.

Commonwealth v. McBride, No. 2521 EDA 2004, at 12 (Pa. Super. 2005) (citation omitted). Although I find the state courts' conclusion problematic in light of my earlier determination that Petitioner's "repeated" admissions of guilt to Annette Beck were made in a joking manner, my conclusion that trial counsel's actions were reasonable renders analysis of the prejudice prong of the Strickland standard unnecessary here.

successful constitutional challenge.[12] (N.T. 2/2/04, at 56-57). Nonetheless, I do not believe that such a conclusion constitutes ineffectiveness *per se* in light of counsel's stated strategy of not challenging references to Petitioner's silence because that testimony was consistent with his defense theory. In support thereof, I note that trial counsel testified that he felt that it was of overriding importance that the jury understand that the police investigation focused exclusively upon Petitioner to the exclusion of other possible investigative leads. Indeed, trial counsel wanted the jury to hear how the tone of Petitioner's interview "shifted from asking questions to becoming essentially accusatory towards [Petitioner], that [Petitioner] wisely – first of all, had no response and eventually said this interview is over and stopped speaking." (N.T. 2/2/04, at 56). Trial counsel went on to explain that "I felt it to be an example of how this investigation had proceeded or more to the point, not proceeded. They were always looking at [Petitioner], as best I could see, no matter what he said or did and I thought it was a perfect example of how that had been badly investigated." (N.T. 2/2/04, at 56-57). Despite the fact that his strategy was ultimately unsuccessful, pursuant to <u>Strickland</u>, I must attempt to "eliminate the distorting effects of hindsight . . . and to evaluate the conduct from counsel's perspective at the time." <u>Strickland</u>, 466 U.S. at 689. In doing so, I find this case closely

---

[12]For example, when questioned about this issue at Petitioner's PCRA hearing, trial counsel first stated "[Petitioner] did not assert his Fifth Amendment right to remain silent, [Petitioner] answered questions." (N.T. 2/2/04, at 56). He also went on to say, however, "I'm sure that one could say that by not responding, as I recall the testimony to have been, or by not answering, he may have been asserting a Fifth Amendment right, although he doesn't specifically say that." (N.T. 2/2/04, at 57).

analogous to <u>Moore v. Deputy Commissioner(s) of SCI-Huntingdon</u>, in which the Third Circuit found that trial counsel had not been ineffective when they "made a conscious determination as to how to proceed" and decided not to object to the admission of evidence of post-arrest silence.[13]  946 F.2d 236, 246 (3d Cir. 1991).  As the Third Circuit pointed out in that case:

> The most we can say is that from our post-trial position, deprived of course of the feel of the trial courtroom, we think that we *might* have recommended something else at the trial if we had been there.  Under <u>Strickland</u> that is not a sufficient basis to find the counsel to have been ineffective.  We can find a Sixth Amendment violation only if we give mere lip service to <u>Strickland</u>.

<u>Id.</u> at 246-247 (emphasis in original).   As in <u>Moore</u>, I "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  See <u>Strickland</u>, 466 U.S. at 689.  As a result, I conclude that trial counsel stated explanation of his trial strategy was constitutionally sufficient.  Accordingly, I must deny Petitioner's claim of ineffective assistance of counsel with respect to his failure to object to references to Petitioner's silence during the direct examination of Agent Fritz.

---

[13]Contrary to Petitioner's assertions, I find <u>Boyer v. Patton</u>, 579 F.2d 284, 288 (3d Cir. 1978), inapposite.  In <u>Boyer</u>, petitioner's trial counsel testified in state court post-conviction proceedings that he could not recall any trial strategy that caused him not to object to testimonial references to the accused's silence at the time of his arrest.  In the instant case, trial counsel clearly set forth his trial strategy in explaining his failure to object to the prosecution's references to Petitioner's silence during his interview with Agent Fritz.

## 2. References During Cross-Examination of Agent Fritz.

The second series of references to which Petitioner objects occurred during trial

counsel's cross examination of Agent Fritz:

Q.   "McBride - - and then you say - - offered no explanation as to the variance in this discrepancy."  What does that mean?

A.   He stood moot [sic] without any response whatsoever.

Q.   Is that what it says or does it say he offered no explanation?

A.   No.  You asked me what I meant by that, and that's exactly what happened.

Q.   So it's not possible that Mr. McBride simply had no explanation for why somebody would say that because it wasn't true.

A.   Could be, yes.

Q.   Could be.  When it says: "McBride offered no explanation as to variance."  Are you telling us then sir, that he said absolutely nothing, or are you telling us that he said he had no explanation for how that might be?

A.   I'm saying that Mr. McBride said absolutely nothing in response to my question.

Q.   Let me ask you this, sir: On those occasions when McBride didn't answer, you specifically say that.  Look at page 4 of your report, second paragraph, "McBride would not answer."  Third paragraph, "McBride would not respond."  In this case you say he had no explanation.  Is there a difference?"

(N.T. 5/10/01, at 46-47).  Trial counsel also elicited the following testimony:

Q.   You then asked him whether the blood located in the apartment could have been caused by the death of his wife, or an assault on her person, he didn't respond?

A.   No, sir, he did not.

Q.   Sat in silence for a few moments?

A.   That's correct.

Q.  And then indicated he did not wish to continue the interview?

A.  That's correct.

Q.  Without the presence of his attorney, isn't that what it says?

A.  Yes.

Q.  Pretty plain at that point in that interview, sir, wasn't it, after you examined him about discrepancies, asked him what his response was, asked him about whether he slept with anybody after his wife left, asking him whether he had any injuries, pretty plain that he's a suspect at that point, isn't it?

A.  Absolutely.

Q.  One of the first things you told us was that you had read him a rights form that he indicated to you he did not wish to sign, right?

A.  Yes, sir.

Q.  And in that rights form, sir, didn't you tell him that he had a right to an attorney present with him during your questioning?

A.  Yes, sir.

Q.  Didn't you tell him that anything you said could and would be used against him in a Court of law?

A.  Yes, sir, I did.

Q.  And didn't you tell him Agent Fritz, aren't you required to tell him that if he wants to stop at any time and consult with counsel, he has that right?

A.  Yes, sir.

Q.  That's what he did, isn't it, stopped, indicated that he wanted to continue -- he would only continue with counsel?

A.  That's right.


(N.T. 5/10/01, at 56-58).

I must apply the Strickland standard and consider whether counsel's conduct fell

below "an objective standard of reasonableness" in failing to raise this claim.  As

previously noted, trial counsel testified at Petitioner's PCRA hearing that his trial strategy

was, *inter alia*, to establish that the police had failed to properly investigate Kelly McBride's disappearance by focusing solely on Petitioner and ignoring all other relevant leads. (N.T. 2/2/04, at 56-57, 59). Counsel made a strategic choice to explore Petitioner's interview with Agent Fritz in order to advance his own theory of the case. See Commonwealth v. Rizzuto, 777 A.2d 1069 (Pa. 2001) ("[w]hile this court strongly prohibits reference to the right to remain silent by the Commonwealth, there is no bar on the defense bringing the information out as a matter of strategy"). In doing so, trial counsel attempted to use cross-examination to explore the difference between not responding to a question and not providing an explanation in an effort to highlight the fact that Agent Fritz's report had unfairly characterized his interview with the Petitioner. (N.T. 2/2/04, at 59). As trial counsel pointed out, "there are places where Fritz is saying that McBride offered no explanation when, in fact, what had occurred was that McBride simply hadn't said anything. Those are two very different concepts." Id. Based on this strategy, trial counsel determined that the benefit of aggressively cross-examining Agent Fritz regarding his interview with Petitioner outweighed any prejudice that was incurred through references to Petitioner's silence. Id. Trial counsel had planned his strategy in an effort to cast doubt on the police investigation and ultimately, to place reasonable doubt in the jury's mind. Although that strategy was ultimately unsuccessful, pursuant to Strickland, I have attempted to "eliminate the distorting effects of hindsight . . . and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. In applying the Strickland standard and considering whether counsel's conduct fell below

21

"an objective standard of reasonableness," I conclude that this claim does not warrant

habeas corpus relief. Thus, this claim is denied.

### 3. References During Cross-Examination of Petitioner Regarding Interview with Agent Fritz.

Petitioner contends that the third series of impermissible references to his

post-<u>Miranda</u> silences occurred during his cross-examination by the prosecution.

Petitioner specifically references the following exchange:

> Q. Now Mr. Fritz says, when he was talking with you, on May 30th of 1984, McBride was asked whether he had been involved in the assault and murder of his wife, McBride denied any such knowledge, indicated he loved his wife, is that what you told him?
>
> A. I don't recall, sir.
>
> Q. McBride was asked whether the blood located in his apartment could have been caused by the death of his wife or an assault on his person, McBride did not respond, do you remember that?
>
> A. No, sir, I don't.
>
> Q. Is Agent Fritz wrong that you didn't respond when he asked you that?
>
> A. I don't recall what I told Mr. Fritz.

(N.T. 5/14/01, at 174-75).

Once again, I must apply the <u>Strickland</u> standard and consider whether counsel's

conduct fell below "an objective standard of reasonableness" in failing to raise this claim,

and thus determine whether this claim warrants habeas corpus relief. Counsel made a

strategic choice to allow the prosecution to question Petitioner about his interview with

Agent Fritz. As trial counsel testified at Petitioner's PCRA hearing, counsel felt that the

questioning "fit the defense theme." (N.T. 2/2/04, at 62-63). Once again, trial counsel felt that the admission of this testimony reiterated his theory that the police investigation had been flawed because it focused solely on Petitioner, to the exclusion of other viable leads. Id. at 64. Trial counsel felt that this interview illustrated Petitioner's realization that he was the main focus of the investigation and that "he finally said, okay, enough is enough, I'm not going to participate in this anymore." Id. Once again, although that strategy was ultimately unsuccessful, pursuant to Strickland, I do not find that counsel's actions fall outside of the "wide range of professionally competent assistance." 466 U.S. at 689. As a result, I must deny Petitioner's claim of ineffective assistance of counsel with respect to his failure to object to these references to post-Miranda silence during his cross-examination by the prosecution.

> **4.    References During Cross-Examination of Petitioner Regarding Interview with Officer Abbey.**

Petitioner next objects to the following references during his cross-examination by the prosecution regarding Petitioner's post-arrest, post-Miranda custodial interview in Florida by Officer Abbey on March 6, 2000:

Q.    Well, Mr. McBride, you agreed to talk to Officer Abbey, didn't you?

A.    No, I agreed to listen to him.

Q.    You answered his questions?

A.    A couple.

Q.     What do you mean, a couple? Do you want me to go through every question and answer on this tape?

A.     If you would like to, I don't really mind.

Q.     You answered every one of his questions, didn't you?

A.     Not every one, no.

(N.T. 5/14/01, at 156).

Petitioner argues that the prosecution deliberately led Petitioner's cross-examination to the above exchange which unconstitutionally referenced Petitioner's post-Miranda silence.  However, review of the relevant testimony in context reveals that the challenged statements were a by-product of the prosecution's attempt to provide evidence of Petitioner's allegedly inconsistent statements as they related to his wife's disappearance.  (N.T. 5/14/01, at 153-158); see Commonwealth v. Crews, 640 A.2d 395, 404-405 (Pa. 1994) (the context of a defendant's silence is critical to an analysis of the prejudicial effect of reference thereto).  While questioning Petitioner about his voluntary interview with Detective Abbey, the prosecution tried to elicit the details which Petitioner had told Detective Abbey regarding his wife's disappearance.  In attempting to pin Petitioner down, the prosecution methodically detailed the interview and in the process, garnered Petitioner's response that he had not answered all of Detective Abbey's questions.  Importantly, the prosecution did not improperly trap Petitioner into referencing his silence during his voluntary interview with Officer Abbey.  Indeed, trial

24

counsel testified at Petitioner's PCRA hearing that he believed the prosecution's question sought "to elicit a response from Mr. McBride that he had answered the questions put to him by Officer Abbey." (N.T. 2/2/04, at 68). Nor was the context of Petitioner's statement one in which jurors would equate invocation of Fifth Amendment rights with an implicit admission of guilt. Crews, 640 A.2d at 405. In support of this conclusion, I note that prior to Petitioner's testimony, trial counsel had repeatedly pointed out in his questioning of Officer Abbey that Petitioner had denied any wrongdoing involving his wife. (N.T. 5/10/01, at 95-100).

Here, the direct examination of Detective Abbey and the cross-examination of Petitioner as related to the statement given to Detective Abbey focused on Petitioner's responses and not Petitioner's silence. Commonwealth v. Jermyn, 533 A.2d 74, 81 (Pa. 1987) (the principle of exclusion from evidence of a Petitioner's post-arrest silence does not extend to instances where Petitioner does not remain silent). As the state court pointed out upon review of this claim, "[t]he prosecution was merely conducting a cross-examination of the Petitioner as to his voluntary responses to [Officer Abbey's] questions." Commonwealth v. McBride, No. 1319-2000, at 11. In applying the Strickland standard and considering whether counsel's conduct fell below "an objective standard of reasonableness" in failing to object to the prosecution's cross-examination, I conclude that this claim does not warrant habeas corpus relief. Because I do not find that

counsel's actions fall outside of the "wide range of professionally competent assistance," this claim of ineffective assistance of counsel is denied.  Strickland, 466 U.S. at 689.

### C. Trial Counsel's Failure to Object to the Showing of Mark Cole's Videotaped Deposition

Petitioner next contends that trial counsel was ineffective for failing to protect his Sixth Amendment right to confront Mark Cole ("Mr. Cole") at trial.  Mr. Cole testified in a videotaped deposition that he met Petitioner at a nightclub in June 1984 where Petitioner allegedly admitted to killing Kelly McBride.[14]  (N.T. 2/2/04, at 83-84). Although Mr. Cole was alive and available to testify in person at the time of trial, the prosecution presented his videotaped testimony with trial counsel's consent.

The Confrontation Clause of the Sixth Amendment, made applicable to the States through the Fourteenth Amendment, provides:  "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  The Supreme Court has recognized that the right of an accused to confront and cross-examine witnesses is essential to due process.  See Chambers v. Mississippi, 410 U.S. 284, 294 (1973).  It is well established that testimony from an earlier sworn proceeding such as a preliminary hearing or deposition may not be admitted if the witness is available to testify at trial.  Barber v. Page, 390 U.S. 719 (1968).

---

[14]Mr. Cole's deposition was videotaped on September 8, 2000, approximately 8 months before trial, due to the fact that Mr. Cole was suffering from advanced AIDS and the prosecution feared that he would not be available for trial.

In the instant case, Petitioner argues that trial counsel was ineffective for failing to object to Mr. Cole's videotaped testimony because (1) admission of the videotape allowed the prosecution to bolster Mr. Cole's credibility by portraying Mr. Cole as a dying man with no incentive to lie; and (2) use of the videotape precluded defense counsel from confronting Mr. Cole about information obtained *after* Mr. Cole's deposition, namely his statement to Detective Nederosdek that Mr. Cole did not think that Petitioner killed Kelly McBride and information which indicated that Mr. Cole was intermittently incarcerated in the summer and fall of 1984.

Upon review of this claim, the state court concluded that "[a]t the time of trial, [trial counsel] made a reasoned strategic choice not to require Mark Cole to personally appear at trial. The evidence shows that [trial counsel] reasonably believed that he had effectively undermined the credibility of Mr. Cole during his deposition and that having Mr. Cole appear in person would only undermine the defense."[15] Commonwealth v. McBride, No. 1319-2000, at 14 (PCRA Ct. Aug. 5, 2004).

I conclude that the state court disposition of this claim was reasonable. See 28 U.S.C. § 2254(d). At Petitioner's PCRA hearing, trial counsel clarified his strategy for allowing the videotaped testimony:

---

[15]The Pennsylvania Superior Court adopted the findings and conclusions of the PCRA court on this issue without specific discussion, noting that "[t]he PCRA court's well-reasoned opinion establishes that [Petitioner] is not entitled to relief." Commonwealth v. McBride, No. 2521 EDA 2004, at 12 (Pa. Sup. Oct. 25, 2005).

> Q.  Did you require the Commonwealth to make a showing that he was, at the time of trial, then unavailable to testify?
>
> A.  No, I didn't . . . I didn't want him to be available, and I was hoping that the Commonwealth wouldn't call him, primarily because I believe that we had it about as well as we were ever going to get it on his deposition.
>
> Certainly by the time of trial he would have been able to figure out that the conversation couldn't have occurred when he first said it did. And if, as [Petitioner] suggested, he was simply a liar on this point, why wouldn't he simply just change his testimony and say, oh, I was mistaken before, but now I remember exactly when it was?
>
> So I was concerned about having him make an effort to correct his testimony at trial, and I was very happy to have him not appear as a live witness.

(N.T., 2/2/04, 86-88).  Trial counsel also explained that he did not impeach Mr. Cole directly, because he thought a cross-examination "invit[ing] an explanation would be ineffective . . . . I specifically didn't want somebody that I believed to be a liar to be offered an opportunity to explain why he's not lying."  Id. at 93.  As the state court concluded upon review of this claim, trial counsel made a reasonable strategic choice to use the videotaped testimony in an attempt to discredit Mr. Cole.  Commonwealth v. McBride, No. 1319-2000, at 14 (PCRA Ct. Aug. 5, 2004).  For example, when faced with the prospect of providing the prosecution with the opportunity to rehabilitate Mr. Cole on the witness stand, trial counsel chose to limit the prosecution's ability to do so by showing the videotaped testimony.  In making that decision, trial counsel testified that he weighed the potential advantages of showing the videotaped testimony to the jury versus presenting Mr. Cole's live testimony.  (N.T. 2/2/04, at 87-88, 121-23).  Counsel felt that

rehabilitation of the witness would be far more damaging than the prosecution's attempt to characterize him as a sympathetic figure in his videotaped testimony. I conclude that trial counsel's decision to proceed with the videotaped testimony is clearly a strategic decision entitled to deference. <u>Strickland</u>, 466 U.S. at 689.

Petitioner also argues, however, that trial counsel was ineffective for allowing Mr. Cole's videotaped testimony because use of the videotape precluded trial counsel from confronting Mr. Cole about his statement to Detective Nederosdek that Mr. Cole did not think that Petitioner killed Kelly McBride.[16] It also prevented trial counsel from questioning Mr. Cole about the fact that he was intermittently incarcerated in the summer and fall of 1984.[17] Although it is true that Mr. Cole was never directly questioned regarding his statement to Detective Nederosdek, this evidence was presented at trial when, upon questioning by trial counsel, Detective Nederosdek testified that his notes indicated that Mr. Cole thought that Petitioner would never commit the crime. (N.T. 2/2/04, at 92). Moreover, information regarding Mr. Cole's sporadic incarceration during the time frame of the alleged confession was rendered cumulative when trial counsel presented a stipulation to the jury that Petitioner was incarcerated continuously from May

---

[16]This information was provided to the defense by the prosecution after Mr. Cole's deposition was entered into evidence. (N.T. 5/11/01, at 13-14, N.T. 2/2/04, at 89-92; Pet'r's Ex. N, Page 47 of Detective Nederosdek's Notes).

[17]By way of background, Mr. Cole had stated in his videotaped deposition that Petitioner's alleged confession occurred in June, during the warm weather months. In light of the fact that Petitioner was incarcerated from May 1984 through September 1984, and Mr. Cole was also incarcerated for part of that time, Petitioner argues that Mr. Cole should have been directly cross-examined on the timing of the alleged confession in order to cast doubt upon its veracity.

11, 1984 through September 20, 1984, proving that it was impossible for Petitioner to have confessed to Mr. Cole during the summer months. (N.T. 5/14/01, at 53). In any event, trial counsel also attacked Mr. Cole's credibility through Detective Nederosdek's testimony:

> I asked [Detective Nederosdek] a series of questions about Mr. Cole, whether he was a paid informant, and he said that he was. And I asked him whether he had told the grand jury that he used to pay Cole for his information and that he would use that money to get drugs, and he said that was possible. And he used that information to get out of whatever trouble he was in, and he said that was correct . . .

(Id. at 89, 91-92). Trial counsel strategically chose to present evidence impeaching Mr. Cole's testimony to the jury through both the detective's testimony and a stipulation. In doing so, trial counsel did not incur the risks inherent in putting Mr. Cole on the stand. His strategy was reasonable.[18]

---

[18]Petitioner relies upon Commonwealth v. Baxter, 640 A.2d 1271 (Pa. 1994), for the argument that there was no reasonable basis for trial counsel's failure to impeach Mr. Cole at trial. In Baxter, trial counsel failed to investigate and discover that a key witness was incarcerated at the time that the defendant allegedly confessed to him, directly contradicting the witness's testimony. The Pennsylvania Supreme Court held that counsel's failure to investigate and impeach that key witness was ineffective assistance of counsel in the absence of a reasonable strategic basis for not impeaching him. Commonwealth v. Small, 980 A.2d 549, 565 (Pa. 2009) (citing Baxter, 640 A.2d at 1274-75). I conclude that Baxter is inapposite. In contrast to counsel's action in Baxter, trial counsel did attempt to attack Mr. Cole's credibility by entering a stipulation at trial stating that Petitioner was incarcerated during the time when Mr. Cole alleges the confession took place. This stipulation directly contradicted Mr. Cole's version of events. In light of the significant credibility issues presented by this stipulation and the potential rehabilitation which may have occurred if Mr. Cole testified at trial, counsel's decision to agree to the use of the videotaped deposition was reasonable.

In sum, Petitioner has not carried his burden of showing that the state courts' findings and conclusions were objectively unreasonable. "It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." <u>Strickland</u>, 466 U.S. at 689. At the time of trial, counsel made a reasoned strategic choice not to require Mr. Cole to personally appear at trial because he reasonably believed that he had effectively undermined the credibility of Mr. Cole during his deposition. Moreover, it was reasonable for counsel to conclude that Mr. Cole's in-court appearance would have increased the potential damage to the defense. Because counsel's actions were reasonable, this claim is denied.

### D. Whether Trial Counsel Was Ineffective for Failing to Object to Instances of Alleged Prosecutorial Misconduct.

Petitioner's last claim is that counsel was ineffective because he failed to object to alleged material misstatements of fact set forth by the prosecution during Petitioner's cross-examination and the prosecution's closing argument. Although Petitioner is not directly claiming prosecutorial misconduct, I must first determine whether the prosecutor's disputed comments violated Petitioner's right to due process before I can determine whether trial counsel's failure to object constituted ineffective assistance of counsel. <u>See</u>, <u>e.g.</u>, <u>United States v. Miles</u>, 53 Fed.Appx. 622, 630 (3d Cir. 2002). In <u>Smith v. Philips</u>, 455 U.S. 209, 219 (1982), the United States Supreme Court held that the

touchstone of due process analysis in cases alleging prosecutorial misconduct is the fairness of the trial rather than the culpability of the prosecutor. The standard is not whether the prosecutor's remarks were undesirable or even universally condemned, but rather, whether the prosecutor's remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637 (1974)); see generally Caldwell v. Mississippi, 472 U.S. 320, 338 (1985) (warning against "holding every improper and unfair argument of a state prosecutor to be a federal due process violation"). For misconduct to amount to a denial of due process, a petitioner must make a showing of "egregious" misconduct. Ramseur v. Beyer, 983 F.2d 1215, 1239 (3d Cir. 1992). Moreover, to qualify for relief, the alleged error must have had a "substantial and injurious effect" on the verdict. Brecht v. Abramson, 507 U.S. 619, 637 (1993).

Petitioner alleges that trial counsel should have objected to two instances of prosecutorial misconduct which he alleges had a pervasive insidious effect on his trial. He first contends that the prosecution repeatedly attempted to label him as a liar both during Petitioner's cross examination and in the prosecution's closing argument by alluding to the fact that Petitioner had created fictional characters in order to cast blame elsewhere for his wife's death. By way of background, an integral part of Petitioner's defense was the argument that Kelly McBride had been friendly with a man named "Danny" and a group of his friends. The existence of these individuals was relevant to Petitioner's defense strategy for two reasons. First, Petitioner testified at trial that the

dresser discovered in his attic with traces of blood and hair was broken during a "scuffle" between Danny and his friends while they were in Petitioner's home. (N.T. 5/14/01, at 79). According to Petitioner, one of the men involved in the fight had cut his leg on the broken dresser drawer. (N.T. 5/14/01, at 79). Secondly, Petitioner also testified that, on the day of his wife's disappearance, he saw his wife driving in a blue Mustang with an individual he recognized as one of "Danny's friends."[19] (N.T. 5/14/01, at 67-68).

During cross-examination, the prosecution asked Petitioner the following questions regarding these individuals:

> Q. And what I want to know is this: You are charged with homicide, and one of the issues that you want this jury to believe is that there is a Danny out there somewhere, who the Wiener boys know, who are friends of yours, and I want to know whether your investigator found these guys?
>
> A. Not that I am aware of.
>
> Q. Isn't it a fact that no one could find these guys, because they don't exist, do they?
>
> A. Yes, they do.
>
> Q. This Danny doesn't exist?
>
> A. Yes, he does.
>
> Q. And his friend doesn't exist?
>
> A. Yes, sir, he does.

---

[19] At trial, Detective Nederosdek acknowledged that he had investigated a man named William Firestone, who had allegedly known Petitioner, and who also owned a blue Mustang and was friends with a man named Daniel Fehnel. (N.T. 5/11/01, at 78-79). According to Detective Nederosdek, Mr. Firestone did not corroborate Petitioner's version of events. (N.T. 5/11/01, at 79).

Q.      And the only people that see him are you?

A.      That's not true.

(N.T. 5/14/01, at 163).  During closing argument, the prosecution discussed Petitioner's

testimony as such:

> No corroboration on anything he says.  These people are imaginary people.
> No one knows who they are.  All of these circle of people, the grand jury
> sees all of these witnesses.  You see all of these witnesses, parties, people
> who have been there, none of them know Danny.  No one knows Danny's
> friend.

(N.T. 5/15/01, at 100).

Petitioner also contends that the prosecution made material misstatements of fact

in his closing argument regarding sightings of Kelly McBride after her February 18, 1984,

disappearance.  More specifically, he alleges that the prosecutor erroneously stated that

"[n]o one ever [saw] Kelly" after February 18, 1984.  (N.T. 5/15/01, at 98).  In rebuttal,

Petitioner notes that there were five separate sightings of a woman matching Kelly's

description during April 1984.  (N.T. 5/8/01, at 137-151).

Following the denial of his claims on direct appeal, Petitioner argued in the PCRA

court that trial counsel had been ineffective for failing to object to these instances of

prosecutorial misconduct.[20]  The PCRA court examined this claim and rejected it as

---

[20]In a related claim, Petitioner claimed on direct review that the prosecutor improperly
called him a "liar" during closing argument.  In denying this claim, the Superior Court held that
the prosecutor's "comments were made in response to statements made and evidence presented
by the defense, and, therefore, that a new trial is not warranted."  Commonwealth v. McBride,
No. 2939 EDA 2001, at 9.  In support thereof, the Superior Court recounted the trial court's

meritless.[21]   In disposing of the claim that the prosecution had made misstatements of fact

in order to characterize him as a liar, the PCRA court concluded that the prosecutor's

questions during cross-examination were within the fair range of cross-examination and

that there was a lack of evidence to show prosecutorial misconduct during the

prosecutor's closing argument.  Commonwealth v. McBride, No. 1319-2000, at 17-18

(PCRA Ct. Aug. 5, 2004).  In addressing the issue of sightings of Kelly McBride, the

PCRA court concluded:

> . . . [T]here is a lack of evidence to establish that the prosecution made any
> misstatements.  Although the prosecution argued in its closing that no one
> saw Kelly McBride after February 18, 1984, it also stated that a few people
> called the police to report seeing Kelly McBride missing.  (N.T., 5/15/01, at

---

discussion of this claim:

> At trial, Defendant admitted that he had a history of making false statements to the
> police and committing crimes of dishonesty.  Additionally, Defendant conceded
> that he had given inconsistent statements to law enforcement authorities
> concerning the identity of an individual he claims ran off with his wife.
> Defendant admitted to lying on a marriage application by affirming that he had
> never been married, when [in] fact he had.  Finally, Defendant admitted that he
> was living under an assumed name and social security number in Florida prior to
> the time he was apprehended.
>
> In his closing argument, defense counsel invited the jury to consider whether or
> not Defendant was lying.  He further remarked that Defendant has "a lot to
> explain," and that he explained it the best way he could.  Finally, defense counsel
> asked the jury to consider whether it would be unusual for someone in
> Defendant's embarrassing situation to "make something else up" (referring to
> Defendant's admission at trial that he had lied when he told Wife's friends that
> she had left with her father).

Id.  The Superior Court also noted that the jury was instructed that such arguments were not
binding, and that the jurors were the sole judges of the facts.  Id.

[21]The Pennsylvania Superior Court adopted the findings and conclusions of the PCRA
court on this claim without discussion.  Commonwealth v. McBride, No. 2521 EDA 2004, at 12
(Pa. Sup. Oct. 25, 2005).

98, 120).  We find that comments were within the fair range of closing argument and it was for the jury to determine the credibility of the witnesses.  Additionally, as set forth previously, the record is clear that the trial judge instructed the jury that closing arguments are not binding, and that the jurors were the sole judges of the facts.  Accordingly, we find that the Petitioner's claim must fail.

Commonwealth v. McBride, No. 1319-2000, at 19 (PCRA Ct. Aug. 5, 2004).

Upon review of the trial transcript, I conclude that the prosecutor's conduct did not render Petitioner's conviction a denial of due process.  Under Pennsylvania law, it is well established that a prosecutor is free to argue that the evidence leads to guilt and is permitted to suggest all favorable and reasonable inferences that arise from the evidence. Commonwealth v. Rios, 684 A.2d 1025, 1032-1033 (Pa. 1996) (citing Commonwealth v. Sam, 635 A.2d 603 (Pa. 1993), cert. denied, 511 U.S. 1115 (1994)); see also United States v. Werme, 939 F.2d 108, 117 (3d Cir. 1991) ("[t]he prosecutor is entitled to considerable latitude in summation to argue the evidence and any reasonable inferences that can be drawn from that evidence").  A prosecutor may also argue his case with logical force and vigor.  Id. (citing Commonwealth v. D'Amato, 526 A.2d 300 (Pa. 1987)).  "If a defendant testifies on his own behalf, as occurred here, a prosecutor may attack his credibility to the same extent as any other witness."  Fahy v. Horn, 516 F.3d 169, 203 (3d Cir. 2008) (citing Fitzpatrick v. United States, 178 U.S. 304, 315 (1900)).  "This does not mean, however, that a prosecutor may express his personal belief as to the credibility of a witness or the guilt of a defendant."  Id. (citing Berger v. United States, 295 U.S. 78, 88 (1935)); see also Commonwealth v. Jones, 811 A.2d 994, 1006 (Pa.

2002) (stating that a prosecutor may comment on credibility as long as the comment does not include an expression of personal opinion). In the instant case, the prosecutor's comments were not an impermissible expression of personal opinion, but rather an attack on Petitioner's credibility. Petitioner's defense strategy was that someone else, possibly Danny or one of his friends, was involved in his wife's disappearance. The prosecution may have questioned the existence of Danny and his group of friends in an attempt to convey the idea that no one could corroborate Petitioner's version of events; however, such comments were not sufficiently egregious to deprive Petitioner of his due process right to a constitutionally fair trial. Detective Nederosdek had testified that he had investigated and interviewed one of "Danny's" friends. (N.T. 5/11/01, at 78-79). Clearly, the jury had been placed on notice that such individuals existed. Placed in context, the prosecutor's commentary was simply an overzealous attempt to attack Petitioner's credibility. In a similar manner, when the prosecution stated that Kelly McBride had not been seen since February 18, 1984, he was overstating the obvious. (N.T. 5/15/01, at 98). Indeed, the prosecutor subsequently acknowledged that "a few people" had called the police to report that they had seen someone who matched Kelly McBride's description after February 18, 1984. (N.T. 5/15/01, at 98, 120). However, none of those sighting ever resulted in a positive identification of Kelly McBride. Consequently, it is technically correct that a person positively identified as Kelly McBride had not been seen since February 18, 1984. Such statements are within a reasonable range of oratorical flair.

This court also notes that the trial court properly instructed the jury on the role of closing arguments by instructing them that jurors were the sole judges of the facts (N.T. 5/15/01, at 8), thereby negating any prejudice that Petitioner theoretically could have suffered. See Ramseur v. Beyer, 983 F.2d 1215, 1239 (3d Cir. 1992) cert. denied, 508 U.S. 947 (1993). Given the trial judge's admonition to the jury to place the parties' closing arguments in proper perspective, I find no evidence to support the argument that the jury would be unable to follow the court's instruction. Upon consideration of the foregoing, I conclude that the disputed comments do not amount to prosecutorial misconduct. Consequently, counsel's failure to object to the prosecutor's comments, either taken together or separately, did not fall below the standard of objectively reasonable conduct.[22] See generally Strickland, 466 U.S. at 689-690. As a result, this claim will be denied.

## IV.    CONCLUSION:

After close and objective review of the arguments and evidence, I conclude that Petitioner's petition for writ of habeas corpus is meritless. The state courts' conclusion that counsel did not render ineffective assistance was not an objectively unreasonable application of United States Supreme Court precedent. As a result, Petitioner's petition will be denied.

---

[22]To the extent that Petitioner argues that the prosecution improperly referenced his experience with other criminal cases and unreliable sightings of individuals on America's Most Wanted, the factual basis for this claim was not presented to the state court and is unexhausted and procedurally defaulted. See 28 U.S.C. § 2254(b)(1); Hubbard v. Pinchak, 378 F.3d, 333, 338 (3d Cir. 2004).

Similarly, because Petitioner's claims are both legally and factually meritless, there is no need to conduct an evidentiary hearing nor is there a need to appoint counsel, as neither would change the outcome of this matter.  <u>See</u> 28 U.S.C. § 2254(e)(2), 18 U.S.C. § 3006A; <u>see</u> <u>also</u> <u>Schriro v. Landrigan</u>, 550 U.S. 465, 474 (2007) ("an evidentiary hearing is not required on issues that can be resolved by reference to the state court record") (citations omitted); <u>see</u> <u>also</u> <u>Campbell v. Vaughn</u>, 209 F.3d 280, 221 (3d Cir. 2000).

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JAMES WILLIAM MCBRIDE,           :        CIVIL ACTION
                      Petitioner,        :
                                        :
           v.                        :
                                        :
GEORGE PATRIC, THE DISTRICT      :
ATTORNEY OF NORTHAMPTON        :
COUNTY, THE ATTORNEY GENERAL   :
OF THE STATE OF PENNSYLVANIA, and   :
SUPERINTENDENT GRACE,            :
SCI HUNTINGDON, PA, et al.,         :
                       Respondents.       :        No. 06-2085

## **O R D E R**

AND NOW, this 29th day of April, 2011, upon consideration of the amended petition for writ of habeas corpus (Doc. Nos. 24, 25), the response thereto (Doc. No. 31), and petitioner's reply (Doc. No. 34), it is hereby **ORDERED** that for the reasons set forth above, the petition is **DENIED WITH PREJUDICE AND WITHOUT A HEARING.**

**IT IS FURTHER ORDERED** that no certificate of appealability will be issued pursuant to 28 U.S.C. § 2253 because petitioner has failed to make a substantial showing of denial of a constitutional right.

The Clerk of Court is hereby directed to mark this case closed.

                                   s/Lowell A. Reed, Jr._____
                                     LOWELL A. REED, JR., S.J.